**STATE of Missouri, Respondent,**

v.

**Mack McCLOUD, Appellant.**

No. 46768.

Supreme Court of Missouri,

Division No. 2.

Nov. 9, 1959.

Charles M. Shaw, Clayton, for appellant.

John M. Dalton, Atty. Gen., J. Burleigh Arnold, Asst. Atty. Gen., for respondent.

LEEDY, Presiding Judge.

Mack McCloud (hereinafter referred to as defendant) was convicted of murder in the first degree in having shot and killed his "common-law wife," Ertha, in St. Louis County on October 23, 1955, and his punishment fixed by the jury at imprisonment in the penitentiary for the remainder of his natural life. Judgment was entered, and sentence pronounced in accordance with the verdict, and he appeals.

He was allowed to appeal as a poor person, and the transcript on appeal was furnished at public expense, and without cost to him, but he has, nevertheless, failed to file a brief. In this situation we look to the assignments of his motion for a new trial (of which assignments there are but two) for the points to be relied on for reversal. These, respectively, complain of the action of the court in receiving in evidence state's Exhibit No. 7, and in giving to the jury Instruction No. 6.

The homicide occurred on the date mentioned, October 23, 1955, about 2:30 A.M., at deceased's home at 712 King Street in Kinloch, in which home defendant had for some months been living with deceased. The killing climaxed an afternoon and night of drinking and revelry which had apparently been in celebration of the visit by Ertha's brother, LeFrance (Pete) Warren, and his wife, who had arrived at Ertha's that day from their home in Chicago. In the course of the evening a trip was made in defendant's car to Chuck & Al's night club on the east side (in Illinois). There were present in that party: The defendant, Ertha, Ertha's brother, LeFrance (Pete) Warren, and the latter's common-law wife, Joan Crawford, and Ertha's uncle, Robert Warren and the latter's wife. On the return trip there was some criticism of defendant's state of sobriety and manner of driving. An argument ensued which culminated in the passengers severally getting out of the conveyance, and finding other means of transportation home. Robert Warren and wife seem to have gotten to their home by bus; the others went by taxi to the King Street address, where, on arrival, they found defendant. It was then about 2 A.M. Deceased went to the kitchen, got a can of beer from the ice box, and began arguing with defendant. She accused him of having put her out of the car, and told him she would not put him out of her house—"I want you to take all your things and pack your clothes and leave." The argument continued, and finally defendant left the premises and went a few blocks to his sister's home where he obtained his pistol, which, at Ertha's insistence, he had left with his sister earlier that evening while en route to the Illinois night club. About ten minutes later he returned to Ertha's home, where, without further ado, he shot and killed her. More particularly, the state's evidence in that regard shows that the door was heard to open, and Ertha was heard to say, "No, Mack," or "Don't do that, Mack," whereupon, the witnesses say, the defendant shot Ertha in the back as she was running away from him, her arms outstretched. She fell to the floor, face up, and he then straddled her body, standing with one leg between hers, and fired a series of shots at her, hitting her at least twice as she was lying on the floor. She had no weapon. He then fled. A post-mortem revealed five wounds were on the body; three were entrance wounds and two exit wounds. A through and through penetrating wound was in the left forearm, the bullet emerging approximately one inch above the wrist, smashing two bones of the forearm. Another bullet had "cut across the upper part of the trachea up through the deep tissues

and veins of the neck and entered into the lower skull" and came out behind the left ear. Another wound was two and one-half inches above the left ear and was traced into the brain. The cause of death was attributed to multiple penetrating gunshot wounds with profound or extensive brain damage.

It appears that defendant voluntarily surrendered himself to the law enforcement officers of St. Louis County at about 8 P.M., on October 23, following the killing which had occurred in the early morning hours of that day. He had in his possession at that time, and delivered to the officers, a gun or pistol and a clip for it containing two shells. It was identified as the gun with which Ertha was killed. He made a lengthy statement at that time, which was reduced to writing and signed by him. No question arose at the trial, nor is any raised here, as to the voluntary nature of that statement. It covers some seven pages of the transcript, and sets forth in detail the defendant's activities from 7 A.M., on Saturday, October 22, until after the killing, including his version of the facts and circumstances immediately surrounding the homicide. With respect to the latter, it is sufficient to say that the statement is exculpatory in nature, being to the effect that Ertha was advancing on him with a knife in her right hand and threatening to kill him; whereupon he said to her, "You get back. You know I ain't going to let you cut me with that knife;" that she nevertheless "kept coming," repeating that she would kill him, and "then I pulled the gun out of my pocket with my right hand and I shot her. She fell to the floor and the knife fell out of her hand, and I said, 'Uh, huh, you had a knife; that's your brother's knife.' I didn't say another word. I turned around and walked right out of the door and got in my car and drove off."

The defendant did not testify at the trial, but his entire statement (state's Exhibit No. 7), from which the foregoing excerpts have been taken, was offered by the prosecution not as a confession, but as an admission against interest. It was admitted over defendant's objection "that it is an exculpatory statement which sets up a defense for the defendant and is not incriminating. It is, in effect, an attempt by the state to put on evidence for the defendant. It does not aid the state, nor is it in any way material to murder in the first degree, murder in the second degree, or manslaughter."

■ That defendant shot the deceased was an admission of fact pertinent to the issue, which, taken in connection with other facts attending the killing, as developed by the state's eyewitnesses, as hereinabove described, tended strongly to prove accused guilty of murder in the first degree. The statement was not rendered inadmissible by reason of the fact that defendant therein sought to excuse the killing as having been committed by him in self-defense. "Statements freely and voluntarily made by a person accused of crime, *including admissions contained in a statement purporting to be exculpatory in general,* are admissible against him upon his trial for the crime to which they relate." (Emphasis supplied.) 20 Am.Jur., Evidence, § 559. See, also, State v. Sinovich, 329 Mo. 909, 46 S.W.2d 877, 881 [14, 15], and State v. Cunningkin, Mo. 261 S.W.2d 85, 87 [1-4].

■ Defendant's other point is directed against the giving of state's Instruction No. 6, which reads as follows:

"The Court instructs the Jury that any oral or written statement made by any defendant, even though it should contain matters that prove his guilt, is admissible in evidence against the defendant and is to be given such probative value as evidence as you believe it deserves, if you find it was voluntarily given.

"And in this regard, the Court instructs you that by the term 'voluntary' the Court means not secured by duress, that is by striking or beating the defendant or by threats of physical harm to him, or by promise of immunity to him by anyone competent to grant such immunity.

"However, the Court instructs you that to make a confession voluntary in nature, it is not necessary to show that such confession or statement be spontaneous, that is made without either persuasion or questioning."

Defendant's complaint against this instruction is confined to the use of the word "confession" appearing in the third paragraph thereof. The motion for new trial charges this was error "in that it infers that there is a confession in the case. * * By the use of the legal word 'confession,' the court has in its interest referred to a matter that is not supported by the evidence and has inferred that there is a confession in the case." We need not pause to discuss the characteristics which distinguish a confession from admissions against interest. See 22 C.J.S. Criminal Law §§ 730, 731, 816; 20 Am.Jur. Evidence, §§ 478, 559, 561.

As noted earlier, the state does not contend that Exhibit No. 7 is a confession; but its position was and is that the same constitutes an admission against interest. The use of the word "confession" in the instruction was therefore inept and not called for by the evidence. However, we are not persuaded that it could have had any effect prejudicial to defendant's right to a fair and impartial trial. The first paragraph introduces the subject matter of the instruction not as relating to a "confession," but, on the other hand, to "any oral or written statement made by any defendant," etc., and the particular sentence complained of, after using the word "confession," later refers back, alternatively, to "such confession *or statement.*" Besides this, we find that in the course of the trial defendant's own counsel, in cross-examining a state's witness, referred to the exhibit in question as a "confession he [defendant] had given." (Tr. 141.) In a colloquy which immediately followed, counsel retracted somewhat this reference, saying, "We are talking about a confession that was given at the coroner's court—not a confession, whatever this state's exhibit is that they introduced." And in the course of the colloquy he clarified the whole matter, in the presence of the jury, by the use of this language: "They have seen fit to introduce that [Exhibit No. 7] apparently as a statement against the defendant's interest. * * * It is the very same thing that was put in evidence yesterday, supposedly to be used against the defendant." Throughout the trial, both in the evidence and in the arguments of counsel, except for the one instance just noted, Exhibit No. 7 does not seem to have been referred to as a confession, but, on the contrary, as a statement or admission. We think it obvious that the jury understood that such statement or admission was the matter to which Instruction No. 6 was directed, and that such instruction's loose and casual reference to a "confession," in view of a similar lapse by defendant's counsel, did not render it reversibly erroneous.

We have examined those portions of the record we are required to examine whether error is assigned thereon or not (Rule 28.02, 42 V.A.M.S.), and find no reversible error therein. The judgment is affirmed.

All concur.